UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| WILLIS W. CORBETT, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| ST. LOUIS COUNTY NAACP, et al., | ) | |
| | ) | |
| Plaintiff-Intervenors, | ) | Cause No. 4:01CV02006CDP |
| | ) | |
| EVERET BALLARD, et al., | ) | |
| | ) | |
| Plaintiff-Intervenors, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| RICHARD W. SULLIVAN, et al., | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION

When the political process to redraw the St. Louis County Council district lines failed, the parties brought this suit in federal court. They claim that the current districts violate the constitutional principle of "one person, one vote" and the Voting Rights Act because, in light of the 2000 census, the seven County Council districts have unequal populations. The parties have therefore asked the Court to declare the existing district boundaries unconstitutional and to redraw them.

Although ostensibly the parties have asked me to redraw the lines, they

really want me to choose among their competing redistricting plans.  There are three groups of plaintiffs:  Republicans, Democrats, and the NAACP.  Each group initially submitted plans, but the NAACP withdrew its proposed plan during trial and now supports one of the Republican plans.  The Republicans have two proposed plans; the Democrats have one.

I find that it would be inappropriate for me to choose any of the plans proposed by the parties.  Each has advantages and disadvantages, and the Democratic plan is preferable to those proposed by the Republicans, because it better meets the goal of compactness.  Each of the parties' plans, however, has been shown to be a product of political or racial gerrymandering, at least to some extent, and they all consider many factors other than those referenced in the County Charter.  Selecting any of them would be a political act, inappropriate for a judge to take.

I conclude I must draw my own map in order to avoid making a decision based on politics.  In doing so I should only consider the factors required by the United States and Missouri constitutions and those set out in the County Charter, so long as doing so does not run afoul of the Voting Rights Act.  I have done this, and therefore adopt the plan attached hereto as Appendix A.  This plan considers only the three factors listed in the County Charter–equality, contiguity, and

compactness.  It does not consider the history of St. Louis County or its traditional communities of interest because the parties did not present sufficient evidence from which I could apply those considerations.   It does not consider the political consequences because that is not the proper role for a Court.  Although this is certainly not the best way to make such important governmental decisions, where the political process has failed as spectacularly and repeatedly as it has in the St. Louis County Council redistricting process, this appears to be the only solution currently available.

## FINDINGS OF FACT

### The Parties

The initial plaintiffs bringing this suit are Willis W. Corbett, Mary Singleton, Lillian (Juanita) Welker, Judy A. Dabler, John McGowen, Steve Buss, and Dwight M. Scharnhorst.  They are all associated in some way with the Republican Party, at least to the extent that the two plans they propose are those advocated by the Republicans.[1]  All are registered voters in St. Louis County, and

---

[1]   In an unsuccessful attempt to avoid political issues, I initially indicated that we would refer to the parties as the Corbett plaintiffs, the Boone plaintiffs, and the Ballard plaintiffs, and we attempted to do so during the trial.  It soon became apparent that everyone was using "Corbett" and "Republican" intermittently and interchangeably, as they were using "Ballard" and "Democrat" intermittently and interchangeably.  The Boone plaintiffs were fairly consistently referred to as the NAACP.  In the interest of clarity, I will do as the parties did at trial, and most often refer to the party labels.

one resides in each of the seven County Council districts.  Plaintiff Willis W. Corbett, who testified at trial, is African American.

Defendants Richard W. Sullivan, Linda M. Locke, Pamela S. Wright, and Barbara A. Enneking are the members of the Board of Election Commissioners of St. Louis County, and are charged under state law with administering and supervising elections.  While defendants will have the duty of implementing whatever district lines are adopted in this case, they have no authority to draw the lines themselves.  They have consistently remained neutral regarding plan selection, and although their attorneys attended the three-day trial, they took no position on what plan should be adopted, and they presented no evidence and did not examine or cross-examine any witnesses.

The NAACP plaintiff-intervenors consist of the St. Louis County Branch of the National Association for the Advancement of Colored People and its President Ina Boone, along with members Judith Beard, Alan J. Gray, Henry T. Everett, and Elbert Kennedy.  All are African-American or black registered voters of St. Louis County.  Two reside in the County Council's First District, and two reside in the Fourth District.

The Democratic plaintiff-intervenors are Everet Ballard, Rich Collier, Burton A. Boxerman, Mary M. Creamer, Matthew Armstrong, Carl Robert Burns,

Bob Levine, Renee Hardin-Tammons, and Victor Thompson.  All are registered voters in St. Louis County, and at least one of them resides in each of the seven districts.  Plaintiff-Intervenors Everet Ballard, Renee Hardin-Tammons, and Victor Thompson are African Americans.

## The County Charter and the Current Districts

The St. Louis County Charter requires that the county be divided into seven single-member County Council districts, and it is currently so divided.  The County Council is the governing body of St. Louis County.  As set forth in more detail below, population changes reflected in the 2000 census show that the current seven districts are not proportionate, so redistricting is necessary.  The Charter provides for appointment of a "County Council Reapportionment Commission" every ten years.  St. Louis County Charter § 2.035.  Under that provision, County Executive George "Buzz" Westfall appointed such a commission on June 28, 2001, and, as required by the Charter, that commission consisted of seven Republicans and seven Democrats.  A super-majority of nine votes was required to adopt a plan.

The Charter provides that:

The Commission shall reapportion the council districts by dividing the population by the number of council districts established by this charter so that the population of each district shall, as near as possible, equal

that figure and so that each district shall be composed of contiguous territory as compact as may be.

The Commission members' terms expired on December 28, 2001. The Commission had not by that time adopted a redistricting plan. The Republicans actually filed this suit on December 21, correctly anticipating that no plan would be adopted, although the evidence showed that negotiations continued even after suit was filed. There is no procedure for extending the term of the Commission, nor for reconvening the Commission, nor for the redrawing the districts under any other procedure.

The County Council district lines now in existence were determined ten years ago by another judge of this Court, the Honorable Jean C. Hamilton, in a case styled  Fletcher v. Golder, Cause No. 91-2314C (7) (E.D. Mo. February 4, 1992), aff'd, 959 F.2d 106 (8th Cir. 1992). The lines twenty years ago were also decided by a federal judge, the Honorable Clyde S. Cahill, in a case styled Druckenmiller v. Arnold, Case No. 81-1400-C(5)(E.D. Mo. January 18, 1982). Thus, the plan adopted here and which will remain in effect for the next ten years will mark three decades in which the voters of St. Louis County will have their County Council district lines established by a federal judge, rather than by the political process established by the Charter.

With such a pattern, I must conclude that, for some reason I cannot begin to understand, the voters in St. Louis County prefer to have this important governmental task performed by an unelected federal judge who should not be making political decisions.  If this is not their preference, they should certainly establish a new system for deciding the issue before the next census comes around.

### The 2000 Census Data

According to the 2000 U.S. Decennial Census, the total population of St. Louis County, Missouri, is 1,065,315.  The population of the seven County Council districts, as those districts are presently defined, are as follows:

| | |
|---|---|
| First County Council District | 130,142 |
| Second County Council District | 133,569 |
| Third County Council District | 144,329 |
| Fourth County Council District | 145,113 |
| Fifth County Council District | 137,726 |
| Sixth County Council District | 146,783 |
| Seventh County Council District | 178,653 |

The population of St. Louis County is thus not equally apportioned among the seven County Council districts.  The current districts deviate from an "ideal" population of 145,188 by the following percentages:

| | |
|---|---|
| First County Council District | -10.36% |
| Second County Council District | - 8.00% |
| Third County Council District | - 0.59% |
| Fourth County Council District | - 0.05% |
| Fifth County Council District | - 5.14% |
| Sixth County Council District | + 1.10% |
| Seventh County Council District | +23.05% |

The parties all agree that these deviations violate the principle of one person, one vote.

### The Parties' Proposed Plans

The parties initially presented four plans for consideration at trial, but at the end of the evidence, the NAACP withdrew its proposed plan and advocated one of the Republican plans. The Republican plaintiffs presented two plans, referred to as "Corbett One" and "Corbett Two." The NAACP supports the Corbett One proposal. The Democrats presented one plan, referred to as the "Ballard" proposal. Maps depicting these three plans are attached to this Opinion as Appendices C, D, and E.

All three plans provide statistically equal populations. From the ideal district population of 145,188, the overall population deviation for the plans is two

- 8 -

persons under Corbett One, two persons under Corbett Two, and twenty-five persons under Ballard. Uncontested testimony at trial (and common sense) established that these differences are not statistically significant, and that the deviation for each from the ideal population is 0.0%.

None of the three remaining proposed plans has any districts that are not contiguous.

The 2000 census shows that the African-American population of the county has grown from 14% in 1990 to 19% now.[2] The experts agreed that this is a significant change. The other significant change is that generally the white population density has moved westward and southward, while the increase in African-American population has been more generally westward, with black population growth throughout the northern part of St. Louis County.

As was true in the 1990 census, the vast majority of the African-American population in the county remains concentrated in North County in the First and Fourth Districts, although another well-established black neighborhood is located in the central/southeastern part of the county, in the towns of Webster Groves and

---

[2] When discussing the African-American population, I refer to people who identified themselves as "black only" under the 2000 census. During trial, the Republicans often used figures that combine "black only" with people who identified themselves as "multiple race population." The 2000 census allowed respondents to identify themselves as belonging to multiple racial groups. This was not possible in the 1990 census.

Rock Hill,[3] and there are a few other scattered pockets of African-American concentration.  When the current plan was adopted in 1992, the First District had a 65.1% African-American population.  According to her opinion, Judge Hamilton selected this plan ten years ago because it provided the greatest opportunity for blacks to have a meaningful opportunity to participate in the political process.

At the time of the former court case, all the parties (and the Reapportionment Commission) agreed that creation of one district with a significant black majority was an important goal of the redistricting process. Professor Kenneth F. Warren was the Republicans' expert witness ten years ago, but is the expert witness for the Democrats this time around.  He testified before me that his goal in the Fletcher case had been to "make history" by getting a district drawn where an African American could be elected.  In fact, after the adoption of the plan, the First District elected an African American to the County Council for the first time.

With the increase in black population since the last census, and the movement of the population generally westward, the First District as it is currently

---

[3]  I do not need to decide if this is one "community" or "community of interest" instead of two, as there were differing opinions, and no evidence other than opinion, presented on this issue.  The statistics show that this combined area is, historically and currently, an island of African-American concentration surrounded by mostly white residents.

drawn is 78.7% African-American, and the Fourth is 35.9%. No other current

districts have African-American population above 15%. Only the First District

has ever elected an African-American candidate.

The only differences in Corbett One and Corbett Two are in their treatment

of the North County area, which covers the First, Second, and Fourth Districts.

Corbett One, preferred by the Republicans and the NAACP, provides for bare

majority African-American populations in both the First and Fourth Districts, with

the First having 55.5%,and the Fourth having 54.2%. Voting age population is

lower: 51.6% for the First, 49.6% for the Fourth.

The Republicans, but not the NAACP, advocate Corbett Two as their

second choice. The Corbett Two and Ballard proposals are similar in their

treatment of the African-American population in First and Fourth Districts, with

Corbett Two providing 67.1% and 37%, respectively, and Ballard providing

67.5% and 30.5%, respectively.

Both the Democrats and the Republicans called expert witnesses in this

case. As stated above, the Democrats called Professor Warren of Saint Louis

University. The Republicans called Kimball W. Brace, a well-known political

redistricting consultant. Both experts are extremely well-qualified to give the

opinions they gave. Both testified within their areas of expertise and their

- 11 -

opinions were adequately supported and properly admissible.  As is common when well-qualified experts testify on different sides of a case, they had areas of agreement and areas of disagreement.

Both experts testified at length about the percentages of African Americans needed in a district for African-American voters to have an equal and reasonable opportunity to elect a council member of their choice.  Warren believed this number was approximately 67.5%.  Brace testified that the necessary equalizing percentage would vary depending on the particular election in question.  He used a figure of approximately 63%, but he also testified that the Republicans' Corbett One proposal would give an equal opportunity for African-American voters to elect candidates of their choice in both the First and Fourth Districts.  Warren testified that neither of these Corbett One districts would provide an adequate opportunity for African Americans to elect a candidate of their choice, when necessary reductions for voting age population, lower registration and voter turnout, and other historic impediments to African-American participation are considered.

As stated above, the Corbett One and Two proposals are identical in their lines for the Third, Fifth, Sixth, and Seventh Districts, which are located in West

- 12 -

and South County and in the central area of the county.[4]  The Republicans and the

Democrats treat the Fifth, Sixth, and Seventh Districts fairly similarly.  While

there are differences, they are either the result of the plans' different treatment of

the Third District, or they are relatively minor, although, as discussed more fully

below, many of the differences do evince the admitted political motivations on the

part of both parties.

St. Louis County has ninety-one separate incorporated municipalities, and

numerous unincorporated areas.  The cities range from tiny to quite large in both

geography and population.  There is a "large municipalities" organization that

includes cities having more than 10,000 population, but no evidence of how many

cities qualify for this organization was presented.  There was very little evidence

presented regarding how the municipalities and the county government interact.

Maintenance of county roads going through municipalities are, of course, an issue.

Some cities have their own police forces, while others contract with the county for

this service.  Many of the municipalities are covered by multiple school and fire

districts.  The state senate boundaries do not follow municipal boundaries.  The

---

[4] Counsel and the witnesses referred, as do most people in St. Louis, to North County, South County, and West County, and I will also use those designations, as they are descriptive and commonly used by people who live in the St. Louis metropolitan area.  No one in St. Louis ever actually talks about "Central County."

currently existing boundaries approved by Judge Hamilton, and the competing

plans presented to her ten years ago, did not follow municipal boundaries to any

significant extent, and numerous municipalities are now split between two or more

County Council districts.  As expert witness Warren testified, ten years ago "there

wasn't much attention paid to not splitting, frankly, communities."

In addition to the ninety-one municipalities, many of the unincorporated

areas are recognized by the Census Bureau as "census designated places."  A

census designated place comprises a densely settled concentration of population

that is not within an incorporated place, but is locally identified by a name.  These

places are delineated cooperatively by state and local officials and the Census

Bureau, following Census Bureau guidelines.  The only such place that the parties

discussed in any detail at trial was Affton, which was previously incorporated but

went bankrupt in the 1930s, and which all the witnesses agreed was as much a

"community" as many of the incorporated cities.

The main area of difference between the Republican plans and the

Democratic plan is their treatment of the Third District.  Both Corbett proposals

contain a long, irregularly shaped Third District that stretches from a very narrow

section on the eastern border of the county (including only the City of Clayton on

the east) to include all of Chesterfield on the western border, and dipping south to

pick up the town of Clarkson Valley.  This Republican-proposed Third District has a very low compactness score, using accepted measures of compactness.  The Democrats' proposed Third District is much more compact.  The Republican-proposed Third District also has an unusual appearance, with several very narrow areas interspersed with broad areas.  When measures of compactness are applied to the plans as a whole, however, the Republican and Democrat plans score approximately the same.

As set out above, the Republicans argued that I should not hear any evidence of political motivation or effect.  I heard the evidence over that objection, and it showed, not surprisingly, that each party's plan was designed to benefit that party.  The Republican-proposed Third District, in particular, clearly has its unusual shape in order to include as many Republican-leaning municipalities and areas as possible, and to exclude the Democratic-leaning municipalities and areas.  There was no other explanation offered for including Clarkson Valley in the Republican-proposed Third District.  In addition, the Republican-proposed Fifth District follows what the parties described as the "traditional" boundary of Gravois Avenue on the south, but then has a boot-shaped dip southward, dividing the Affton area between its Democratic-voting east side and its Republican-leaning west side.  The only reason offered for this boot-shaped incursion into the

Sixth District is to assure that the Sixth District does not have too high a concentration of Democratic voters. The Democratic plan also shows political motivation. Its northern lines between the Second and Third Districts follow the Democratic-leaning area, and it specifically excludes Ladue from the Third for apparently the same reason.

The Republicans attempted to show that the Democrats' plan divided the municipality of Town and Country into three different council district in order to dilute the "base of power" of Richard "Skip" Mange, the Mayor of Town and Country who was recently elected to represent the Third District. Upon consideration of all the evidence, I do not find this accusation to be justified. Town and Country was divided into two districts in the old plan, it is divided into three different state senate districts and four different state house districts. It is served by two different school districts. Its particular location within St. Louis County, including its being cut by two interstate highways and two major county roads, indicates that dividing it was not necessarily politically motivated. In addition, again over the Republicans' objection, the Democrats presented evidence that their proposed division was a result of political negotiations wherein the Republicans had requested that another area be kept together, which resulted in Town and Country's being split.

- 16 -

My rejection of the Town and Country argument does not mean that I am finding that the Democratic plan was proposed without politics in mind. Exactly the contrary is true. The Democrat plan was proposed to benefit the Democrats, just as the Republican plans were proposed to benefit the Republicans. Based on the records of voter behavior in past elections, however, the evidence reveals that the Republican plan attempts to give an advantage to Republicans that is out of proportion to their voting strength in past elections.

In fact, the evidence shows that should I adopt the Republican plan, it is highly probable that Republicans would be assured of four seats in the County Council for the foreseeable future, even though the County is fairly evenly split between Republican and Democratic voting patterns, with clear Democratic victories in the two most recent state-wide and federal election cycles. The Democratic plan, on the other hand, appears to be an attempt at a fair political compromise that, while not guaranteeing a Democratic majority in the County Council, would at least give the Democrats a chance of winning four of the seven districts. The evidence taken as a whole shows that the Democratic plan is much less one-sided politically than is the Republican plan.

### The Time Constraints for this Case

This case was filed on December 21, 2001, and after limited, expedited

- 17 -

discovery, trial was held January 28, 29, and 30, 2002. The parties stipulated to many matters, and I have used their stipulations in these findings as well as to prepare the redistricting map I adopt here.

The first day for filing a Declaration of Candidacy for election to the St. Louis County Council in the 2002 general election is February 26, 2002, and the last day for such filing is March 26, 2002. The parties therefore urged me to decide this case before February 26, so that persons who may want to file for office will know the district lines before filing.

## CONCLUSIONS OF LAW

The Corbett plaintiffs and the Ballard and NAACP plaintiff-intervenors have challenged the constitutionality of the current St. Louis County Council districts pursuant to 42 U.S.C. §§ 1983 and 1988, alleging violation of their rights under the Fourteenth Amendment to the United States Constitution, as well as related violation of their rights under Article I, § 2 of the Missouri Constitution. Additionally, both the Ballard and the NAACP groups have alleged violation of their rights under the Fifteenth Amendment to the United States Constitution and the Voting Rights Act, 42 U.S.C. § 1973.

This Court has jurisdiction over the subject matter of this action pursuant to

- 18 -

28 U.S.C. § 1343(a)(3) and 42 U.S.C. § 1988.[5]  Venue is proper under 28 U.S.C.

§ 1931(b).  Additionally, a justiciable controversy exists among the parties so that

the Court may declare their rights and legal relations under 28 U.S.C. § 2201, and

may grant further relief under 28 U.S.C. § 2202.

It is undisputed that the existing County Council district lines impair the

rights of citizens to vote by violating the principle of "one person, one vote."  See

Reynolds v. Sims, 377 U.S. 533, 558 (1964).  The current situation, with the

significant population deviation among districts, is impermissible under the

provisions of the Fourteenth Amendment of the United States Constitution.

Connor v. Finch, 431 U.S. 407 (1977).  This population deviation is likewise

impermissible under the provisions of Article I, § 2 of the Missouri Constitution.

Armentrout v. Schooler, 409 S.W.2d 138 (Mo. 1966).

There is no other method described in the St. Louis County Charter for

apportioning these council districts once the Reapportionment Commission was

unable to adopt a plan, so judicial relief is appropriate in light of this legislative

failure.  Reynolds, 377 U.S. at 586.

In Fletcher v. Golder, 959 F.2d 106 (8th Cir. 1992), the Eighth Circuit held

_____

[5]  This case does not require a convention of a three-judge panel because the redistricting involves neither congressional districts nor any statewide legislative body.  28 U.S.C. § 2284(a).

that under the law governing St. Louis County Council redistricting, the District

Court was "required to achieve: (1) equality of population among districts; (2)

geographic compactness; and (3) protection of minority rights." 959 F.2d at 109.

Fletcher also held that political results or motivations were "legally irrelevant,"

because the County Charter only specified equality, compactness, and contiguity.

The parties today disagree about the factors that I should use to decide what

plan to adopt, although they all urge that I consider numerous things other than

equality, compactness, contiguity, and racial fairness. While stating that they

recognize that I could draw my own plan, their entire presentations at trial were

focused on attempting to prove that their respective proposed plans were better

than that of their opponents. I conclude that both the Corbett Two and the Ballard

proposals meet all legal requirements. The Ballard proposal is more compact and

contains less political gerrymandering, while Corbett Two respects municipal

boundaries. If I had to choose among the three plans proposed at trial, I would

choose Ballard, because it best meets the factors of equality, compactness and

contiguity set out in the County Charter.

Although it is undisputed that the Republican plan will confer great political

benefit on the Republican Party and was drawn with that intent in mind, the

Republicans say I cannot consider either the political outcome or the parties'

- 20 -

political motivation in deciding this case.  The Democrats say I can, and should,

consider political factors as one of the "traditional redistricting principles" used in

drawing voting districts.[6]

I conclude that it would be inappropriate for me to select any of the parties'

proposed plans.  I will first discuss the relative merits of the three proposals under

the County Charter factors of equality, compactness, and contiguity, and under the

Voting Rights Act.  I will then discuss the other so-called "traditional" factors that

the parties raised at trial.  I will then explain the plan that I have chosen to adopt.

## Population Equality

It is clear that redistricting is primarily the duty and responsibility of the

legislature.  Chapman v. Meir, 420 U.S. 1, 27 (1975).  When the political process

fails, however, courts are often forced into an unwanted controversy.  As a basic

constitutional standard, the Equal Protection Clause of the United States

Constitution requires "equal representation for equal numbers of people."  U.S.

Constit. amend 14.  Article I, § 2 of the Missouri Constitution declares that "all

persons are created equal and are entitled to equal rights and opportunity under the

law."  Additionally, § 2.035 of the St. Louis County Charter demands that the

---

[6]  The Democrats allege that political motivations are especially relevant when addressing partisan gerrymandering.  See Davis v. Bandemer, 478 U.S. 109 (1986).  They did not plead this claim in their complaint, however.

population of each electoral district shall, as nearly as possible, be equal.

When adopting or drawing a redistricting plan, "population is the starting point for consideration and the controlling criterion for judgment." Reynolds, 377 U.S. at 567. The court's primary obligation is to ensure that the districts are substantially equal in population and thereby comport with the principle of "one-person, one vote." Id. at 577. A court should be mindful that "absolute population equality [is] the paramount objective." Karcher v. Daggett, 462 U.S. 725, 732 (1983). A court-ordered plan is subject to higher standards of population equality than a legislative one. Abrams v. Johnson, 521 U.S. 74, 98 (1997). A plan should "ordinarily achieve the goal of population equality with little more than de minimis variation from strict population equality." Chapman, 420 U.S. at 26-27. The cases recognize, however, that "the requirement is not an inflexible one," Voinovich v. Quilter, 507 U.S. 146, 161 (1993), but that substantial deviations may require justification. Id., citing Brown v. Thomson, 462 U.S. 835, 842-843 (1983).

I find that all three redistricting plans provide statistically equal populations. In Karcher, the Supreme Court recognized that "rapid advances in computer technology and education during the last two decades make it relatively simple to draw contiguous districts of equal population and at the same time to further

- 22 -

whatever secondary goals the state has." 462 U.S. at 725.  That principle has been amply demonstrated here, as the overall population deviation among the plans is far smaller than population deviations discussed in many of the redistricting cases of the past two decades.  All three proposed plans provide population equality, and none violates the principle of "one person, one vote."

The expert witnesses at trial agreed that the differences here are not statistically significant, and the deviation for each from the ideal population is 0.0%.  Any deviation from the ideal of figure 145,188 is the result of the parties' good faith effort to achieve population equality.  Testimony at trial also established that census data have at least a 1% error rate, adding to the common-sense interpretation that statistically insignificant really means these proposed maps each provide districts that are equal in population.[7]  To assert as the Republicans do, that I must choose their plan because it misses the mark by two people out of 145,188, rather than by 25 of that same number is certainly political "hair splitting."  See Hastert v. State Board of Elections, 777 F.Supp. 634, 645 (N.D. Ill. 1991)(finding that "minute population deviations remain legally significant," but deciding the case on other bases).

---

[7]  Even deviations smaller than the census margin of error must be the result of a good faith effort to achieve population equality.  Karcher v. Daggett, 462 U.S. at 738-40.

**Compactness and Contiguity**

Geographic compactness and contiguity are required by § 2.035 of the St.

Louis County Charter.  They are also factors set forth in Article 3, § 2 of the

Missouri Constitution, although that provision relates directly to the Missouri

House of Representatives.  These provisions stress that each electoral district must

be "composed of contiguous territory as compact as may be."  Some cases suggest

that compactness needs only to be looked at as an indicator that something may be

amiss in the redistricting scheme.  See Hunt v. Cromartie, 526 U.S. 541, 555

(1999) (noting a bizarre configuration of an electoral district is the traditional

hallmark of gerrymandering) (Stevens, J., concurring in the judgment).  But since

compactness is specifically designated by both the County Charter and the

Missouri Constitution, I must examine the proposed plans for compactness.

Warren testified that using the population polygon test to determine

compactness, the Ballard Third District is significantly more compact than either

Corbett proposals.  With a score of 1.0 being compact, the Third District under

Ballard scored 0.86 while the Third District under both Corbett proposals scored

0.61.  The Corbett proposals are less compact because they stretch from the City of

St. Louis on the east and take in the entire City of Chesterfield on the western

boundary of the County.  Based on a composite measuring all seven districts,

however, the three plans were essentially the same in terms of overall compactness. I conclude from the evidence that Ballard is a better plan because of the compactness of the Third District. Were I to select one of the plans proposed, I would choose Ballard because it best meets the goals of equality, contiguity, and compactness.

## **Voting Rights Act**

Any redistricting plan adopted by the Court and implemented by the St. Louis County Board of Elections has to comply with the requirements of the Voting Rights Act ("VRA") of 1962.[8]  Congress enacted § 2 of the VRA to help effectuate the Fifteenth Amendment's guarantee that no citizen's "right to vote shall be denied or abridged an account of race, color, or previous condition of servitude." U.S. Const. amend. 15.

In 1982, Congress amended § 2 to prohibit legislation that results in the dilution of a minority group's voting strength, regardless of intent. See 42 U.S.C. § 1973.  Section 2(a) specifically prohibits the imposition of any electoral practice or procedure that "results in a denial or abridgment of the right of any citizen of

---

[8]  Section 2 of the Voting Rights Act, 42 U.S.C. § 1973, applies when a court, after considering competing proposals, orders a redistricting plan into effect. On its face, § 2 does not apply to a court-drawn and -ordered redistricting plan. Abrams v. Johnson, 521 U.S. 47, 90 (1997). A court, however, should still comply with this section when exercising its equitable powers to redistrict. Id.

the United States to vote on account of race or color." 42 U.S.C. § 1973(a). This statute is violated if, based on the totality of the circumstances, "it is shown that the political processes leading to nomination and election in the State or political subdivision are not equally open to participation" by the protected class in that "its members have less opportunity to participate in the political process and to elect representatives of their choice." 42 U.S.C. § 1973(b).

Section 2 contains no per se prohibitions against particular types of electoral districts. "It says nothing about majority-minority districts, districts dominated by certain political parties, or even districts based entirely on partisan political concerns. Instead, § 2 focuses exclusively on the consequences" of redistricting. Voinovich v. Quilter, 507 U.S. 146, 155 (1993). The statute essentially prohibits any act that, "interact[ing] with social and historical conditions," impairs the ability of a protected class to elect its candidate of choice on an equal basis with other voters. Thorburg v. Gingles, 478 U.S. 30, 47 (1986).

Plaintiffs seeking to protect their constitutional rights can establish a § 2 violation by proving three factors, as first set forth in Gingles: (1) the minority group is sufficiently large and geographically compact to constitute a majority in a properly drawn single-member district; (2) the minority group is politically cohesive; and (3) that racial bloc voting typically frustrates the election of the

- 26 -

minority group's preferred candidate.  Id. at 50-51.  A minority group satisfying

these conditions is then entitled to consideration of its claim on the merits under

the totality of the circumstances test.  Id.

Based on the evidence presented at trial, I find that the Democrats and the

NAACP, who have both pleaded a violation of the VRA, have satisfied the

Gingles preconditions.[9]  First, the African-American community in St. Louis

County is sufficiently large and geographically compact.  African Americans,

according to the 2000 census data, make up 19% of the St. Louis County

population, an increase of 5% over the last decade.  This number is more than

enough to constitute a majority in a properly-drawn district.  Analysis of maps

showing racial concentrations reveals that blacks are sufficiently compact in the

north and northeast portion of the county.

Second, the African-American community is politically cohesive.  This

factor can be reflected in bloc voting patterns and community interests.  Evidence

of political cohesion is shown by voting preferences, as demonstrated in actual

elections.  Voting patterns in predominantly black precincts reveal that African-

American voters generally support the same candidates, namely Democrats.

---

[9]  The Supreme Court has held that the Gingles preconditions apply in challenges to
single-member districts, as is the case in St. Louis County, as well as multi-member districts.
Growe v. Emison, 507 U.S. 25, 40-42 (1993).

Moreover, being an urban minority population, they have a sufficiently strong community interest to warrant being a majority-minority district.

Finally, white voters have historically frustrated the election of African-American voters' preferred candidate in St. Louis County.  A bloc voting majority must <u>usually</u> be able to defeat candidates supported by a politically cohesive, geographically insular minority group.  <u>Gingles</u>, 478 U.S. at 48-49 (emphasis in original).  Evidence of this factor is again shown from county voting results.  Even though the minority population in the county was 14% in 1990, no County Council district had ever elected an African-American council member until 1994. This took place after Judge Hamilton adopted a redistricting plan that created a super-majority in the First District.  Additionally, no African American has ever been elected in a county-wide race.

After the <u>Gingles</u> factors have been met, a court must then evaluate whether, under the totality of the circumstances, any of the submitted plans dilutes minority voting strength.  The usual device for diluting voting power in single-member districts is the manipulation of district lines.  <u>Voinovich</u>, 507 U.S. at 153.  The dilution of racial minority voting strength may be caused either by "the dispersal of blacks into districts in which they constitute an ineffective minority of voters or from the concentration of blacks into districts where they constitute an excessive

- 28 -

majority." Gingles, 478 U.S. at 46, n.11. These concepts were referred to at trial (and in case law) as "cracking"–dispersal into multiple districts–and "packing"– concentration into one district.

I conclude that the Corbett One proposal violates the VRA by unlawfully diluting the African-American voting strength in the First District. This plan substantially disperses the African-American voters in the First District and relocates them to the Fourth District. The African-American population currently is 78.8% in the First District and 35.9% in the Fourth District. Corbett One shifts the population to 55.5% in the First District and 54.2% in the Fourth District.

In determining whether African-American voters are likely to have an opportunity to elect candidates of their choice, I recognize that there is no bright line rule for what constitutes an effective minority district. Some courts begin their analysis "by assuming 60% of the voting age population is the appropriate target percentage." Nash v. Blunt, 797 F. Supp. 1488, 1499 (W.D. Mo. 1992), aff'd, 507 U.S. 1015 (1993) (also noting that the 60% analysis is superior to the 65% total population figure used by the U.S. Justice Department); Hastert v. State Board of Elections, 777 F. Supp. 634, 647-48 (N.D. Ill. 1991) (noting that "a concentration of 65% total population and 60% voting age minority population is generally regarded as the threshold for a safe minority district").

In arriving at a targeted percentage, a court needs to consider such relevant factors as voting age population, voter turnout, voter registration, and cross-over voting. When voting age population is considered under Corbett One, the African-American voting age population falls to 51.6% in the First District and 49.6% in the Fourth District. Additionally, the experts testified that voter turnout for African-American voters is traditionally less than the turnout for white voters. This is especially relevant because the First District council member is elected during presidential off-year elections, when voter turnout is significantly less.

After measuring voting age population, voter turnout, and cross-over voting, Warren calculated that the First District needs to be approximately 67.5% African American. He testified that a district with a mere 50 or 55% African-American population, such as the First and Fourth Districts under Corbett One, would not provide a minority group a reasonable opportunity to elect its candidate of choice. He stressed that it would be unlikely that an African-American candidate could be elected, absent extraordinary circumstances. Even Brace, using his own numbers, originally testified that the targeted African-American population in the First District should be about 63%, although he also argued that Warren's calculations were wrong.

The Corbett One proposal fails to satisfy the requirements of § 2 because it

- 30 -

simply does not take in account low voter turnout and voter registration.  It is clear that once these factors are considered, the targeted percentage of African Americans in a district should be at least close to 60%.  Corbett One dilutes African-American population to an extent that African-American votes would likely be unable to elect a candidate of their choice.

The Corbett Two and Ballard proposals comply with the VRA by ensuring that minorities have an equal chance of electing their preferred candidates.  Under Corbett Two, the African-American population is 67.1% for the First District and 37 percent for the Fourth District.  Under Ballard, the African-American population is 65.7% for the First District and 30.5% for the Fourth District.  I find that both of these plans are acceptable under the VRA.

The Supreme Court has held that vote dilution can also be shown by examining proportionality.  See Johnson v. De Grandy, 512 U.S. 997 (1994).  "[D]efined as the relationship between the number of majority-minority voting districts and the minority group's share of the relevant population," proportionality "is always relevant evidence in determining vote dilution, but is never itself dispositive."  De Grandy, 512 U.S. at 1025 (O'Connor, J., concurring) (emphasis in original).  St. Louis County's African-American population is 19%.  Each of the seven County Council districts represents approximately 14.3% of the county

population.  Accordingly, under the proportional representation standard, African-Americans should be able to elect at least one county council candidate of their choice.  The Corbett One proposal, by diluting black voting strength, jeopardizes this by splitting African-American voting strength.

Explaining why it supports the Corbett One proposal, the NAACP argues that a super-majority in the First District is no longer necessary because the current council member is African American and so could probably be re-elected even if the African-American percentage of the district were reduced significantly. The Supreme Court in Gingles recognized, however, that incumbency is a special circumstance to be taken into account in evaluating racial bloc voting.  478 U.S. at 57.  Redistricting should not be based on the assumption that an incumbent is going to stay in office, for there is no guarantee that the he or she will seek reelection.  A non-incumbent African-American candidate would have a very difficult time winning in the First District under Corbett One.[10]

The NAACP also argues that a super-majority could result in "cracking" and "packing."  Just as Judge Hamilton rejected this argument in 1992, I find no evidence to support the claim that African Americans have been unnecessarily

---

[10]  The VRA does not require courts to consider other factors such as incumbency and the campaign financing disparity between African-American and white candidates.  See Nash, 797 F.Supp. at 1502.

packed into the First District. Neither the Corbett Two nor the Ballard proposal

achieves the 67.5% endorsed by Warren. Additionally, the minority voting

strength in an adjoining Fourth District has not been substantially weakened under

the two remaining plans.

The Corbett One proposal clearly seeks to maximize the number of African-

American districts in St. Louis County. In fact, an NAACP witness expressly

stated at trial that the goal had been to "maximize the number of districts in which

black voters would have an opportunity to elect representatives of their choice."

The Supreme Court has noted, however, that "§ 2 does not require maximization

of minority voting strength, yet remains faithful to § 2's command that minority

voters be given equal opportunity to participate in the political process and to elect

representatives of their choice." De Grandy, 512 U.S. at 1025 (O'Connor, J.,

concurring).

While the protection of minority voting rights can be a factor in drawing

district lines, race cannot be the predominant factor. Miller v. Johnson, 515 U.S.

900, 915-17 (1995). Racial classifications with respect to voting carry particular

dangers and are often subject to strict judicial scrutiny. Shaw v. Reno, 509 U.S.

630, 657 (1993). "Racial gerrymandering, even for remedial purposes, may

balkanize us into competing racial factions; it threatens to carry us further from the

- 33 -

goal of a political system in which race no longer matters—a goal that the

Fourteenth and Fifteenth Amendments embody, and to which the Nation continues

to aspire." Id.

The evidence shows that race was the predominant factor in drawing the

Corbett One proposal.  This plan deliberately creates two districts with slight

African-Americans majorities, the maximum number possible based on relevant

census data in St. Louis County.  Based on this fact and the NAACP's admission,

it can be inferred that race served as the starting point in the drafting of this plan.

The Corbett One proposal, however, is not subject to strict scrutiny because other

legitimate districting criteria, such as population equality and compactness, were

not neglected in the submitted proposal.  See Bush v. Vera, 517 U.S. 952, 993

(1995) (O'Connor, J., concurring).

While the maximization of African-American voting strength may have

been a legitimate goal in the 1992 redistricting, it is no longer justified.  Section 2

does not require the court to create a second majority-minority district, but it does

require the maintenance of the First District as a majority-minority district.  As

such, Corbett One does not serve this goal.

I conclude that Corbett One violates the Voting Rights Act.  I find that both

Corbett Two and Ballard do not violate the VRA, and so the adoption of either

- 34 -

would be lawful.

## So-Called "Traditional" Factors

The Supreme Court has recognized that slight deviations from population equality are allowed under certain circumstances. Abrams, 521 U.S. at 98. Any deviation from population equality, however, "must be supported by enunciation of historically significant state policy or unique features." Connor, 431 U.S. at 419-420. Specifically, "[a]ny number of consistently applied legislative policies might justify some variance." Karcher, 462 U.S. at 740 (emphasis added). When drawing district lines by judicial order, "a court generally should be guided by the legislative policies underlying the existing plan, to the extent those policies do not lead to violations of the Constitution or the [VRA]." Abrams, 521 U.S. at 79.

It is difficult here to ascertain the true "legislative policies" underlying the existing district lines because of the repeated failure of the St. Louis County to follow its Charter and establish lines through the Reapportionment Commission, which is the legislative method. The existing plan was ordered by Judge Hamilton, who indicated that she considered only three objective factors: population equality, protection of minority voting rights, and geographic compactness. Fletcher, 959 F.2d at 109. The plan ten years before was ordered by Judge Cahill, and his opinion indicated he considered equality, compactness, the

- 35 -

need to maximize minority voting strength to the extent lawful, and the political history of the County, as reflected by the previously drawn lines.  No evidence was presented regarding any factors traditionally considered before that, and thus the evidence before me is only of factors considered in litigation, as opposed to legislation.

The Republicans argue that the St. Louis County Council district lines should, to the extend possible, respect municipal boundaries.  In support, they cited Supreme Court cases which they say "applauded courts or allowed courts even to sacrifice other issues in order to respect a political subdivision boundary." None of these cases, however, involves factors traditionally used in either St. Louis County or the State of Missouri.  See Voinovich, 507 U.S. at 161 (noting that the population deviation is based upon Ohio's constitutional policy in favor of preserving county boundaries); Brown v. Thomson, 462 U.S. 835,  843 (1983) (stating that "[Wyoming]'s policy of preserving county boundaries is based on the state Constitution, has been followed for decades, and has been applied consistently throughout the State"); Reynolds,377 U.S. at 579 (noting that divergences from strict population equality may be based on Alabama's legitimate policy of maintaining political subdivisions).

I have not  discovered any case holding that preserving municipal

boundaries should be considered when redistricting St. Louis County, Missouri, or that it should be considered by a court when it has never before been considered by the political area being redistricted. Respecting municipalities has never been a consistently applied legislative factor in the redistricting process in St. Louis County. There may be numerous reasons for this. One of the more obvious is that any attempt to respect the boundaries of St. Louis County's ninety-one municipalities would simply not be practical. The municipalities vary enormously in geographic size and population. Many municipal boundaries are themselves extremely irregular. For example, Creve Coeur has a jagged northern city limit, which appears to have been designed to include some areas and exclude contiguous ones, possibly for revenue or other reasons. Washington University is largely in unincorporated St. Louis County, as is Lambert Airport, which is owned by the City of St. Louis. A couple of tiny unincorporated areas contain public housing projects, which may not have been very desirable to any of the surrounding towns. It is not hard to conclude that the municipal boundaries of the ninety-one cities and towns were drawn with a variety of interests in mind.

It is virtually impossible not to split a town when redrawing the County Council district lines. Lines were split frequently in the plans in effect for the last two decades. In the absence of evidence showing that respect for municipalities

- 37 -

had been an historical value, the Republicans' attempt to use this as an explanation for their extremely uncompact Third District looks suspiciously like a subterfuge for some other motive.

Over the Republicans' objections, I heard evidence of political motivations regarding the proposed maps. In doing so, I indicated that I would hear all the evidence and later not consider the evidence if I determined that it should not have been received. As discussed above, both parties presented several specific examples showing some level of "political gerrymandering." In Fletcher the Court of Appeals held that evidence of political motivation was irrelevant to deciding the issues of equality, compactness and racial fairness, which were the only factors there considered. Here, however, I find the political evidence is indeed legally relevant because it shows that one of the Republicans' arguments for favoring their plan is false.

The very political evidence that the Republicans say I cannot consider shows that their arguments for respecting municipal boundaries is simply a cover for achieving political benefit. In every other case before me I am allowed to hear one side challenge another's stated reasons for its behavior: to exclude the political evidence here would require me to naively accept what looks like a false statement of a party's reasons for its preference. A judge is not required to close

her eyes to the truth.  The political evidence presented by the Democrats directly

calls into question the genuineness of the Republican claim that respect for

municipal boundaries makes its plan better, and so the political evidence here

meets the test for relevance.

### Conclusion:  The Court-Drawn Plan

Corbett One is a product of racial gerrymandering.  Corbett Two purports to

be based on a "traditional" principle that the evidence shows has never been used

in this jurisdiction before, making that claim highly suspect.  In addition, it

appears that the main difference between the "white" portions of the various plans

is pure and simple political advantage.  Both Republican plans are designed in

hopes of assuring that the Republican Party can win four of the seven council

seats.  While adoption of the Democratic plan would undoubtedly favor the

Democrats, it is not nearly as clear that it would necessarily result in a Democratic

majority on the council.  Still, it reflects a political choice.

When only the factors of equality, contiguity, compactness, and racial

fairness are considered, there are only slight differences between the Corbett Two

and the Ballard plans.  If these were the only choices and the only factors I could

consider, Ballard would prevail because of the compactness of its Third District,

compared to the gerrymandered shape of Corbett Two's Third District.  While the

plans are not very different in terms of equality, compactness, and contiguity, they are extremely different in terms of real political impact. My selection of either one would have serious political results. Fortunately, I am not required to pick one of these plans, but may devise my own plan.

The County Charter requires that districts be equal in population, and that they be compact and contiguous. Of course, the county could legitimately consider many other factors in setting its district lines, so long as it did not run afoul of the state or federal constitution or the Voting Rights Act. When a Court is forced to draw the lines, however, discretion is much more constrained.

The parties have urged that I should consider what they call traditional redistricting factors. In addition to saying I should respect municipal boundaries, Republicans also urge me to consider preserving core constituencies (which they say means to move as few voters as possible from their existing districts), and not pairing incumbents, which they say is a subordinate interest. The Democrats say that preserving political boundaries is a subset of preserving communities of interest, preserving district cores, and ease of administration, and that it is also appropriate for me to consider protecting incumbents and the political fairness of any plan.

Although the parties presented some evidence on some of these "traditional"

some of the factors may have been considered some of the time, the record is completely lacking in evidence that would actually allow me to apply these so-called "traditional" principles to draw my own lines.

I conclude that I should draw my own plan and consider only the factors of equality, contiguity, compactness, and racial fairness. I have done so. A graphical depiction of the plan is attached as Appendix A. A summary of the population, size, and racial make up of the seven districts is attached as Appendix B. Appendix F, which is provided to the parties in print form and in a compact disk, contains the breakdown showing the census blocks included in each district.[11]

The population of the districts range from 144,181 to 144,193, a total deviation of twelve people. As with the plans proposed by the parties, these deviations are not statistically significant, and they were necessary to provide for logical lines. For example, to move people from the Fourth District to either the First or Second in order to achieve actual numerical equality, it would have been necessary to move a single block of residents to a district across an interstate highway or across similar natural boundaries. This simply made no sense, in light

---

[11] Because of its size, Appendix F is not part of the published form of this opinion, although it is, of course, included in the court file and provided to the parties. The CD is presented in the same Excell spreadsheet format which the parties used in their submissions to me.

of the actual, statistical equality otherwise achieved.

The districts are as compact and regular as was possible. When I discussed with the parties at trial the possibility that I would draw my own map, they told me it was more complicated than I thought, and they were right about that. As they correctly pointed out, it is not possible, even with today's computer models, to simply tell the computer to divide St. Louis County into seven equal, contiguous, compact districts. Even the computer takes more guidance than that. Thus, I began with the geographic shape of the County, and then made some subjective decisions. It was logical to begin with the outlying borders. Once the far West, North, and South districts were drawn as compactly and equally as possible (the Seventh, Sixth, and Fourth Districts), I then generally attempted to draw shapes that were logical divisions. These ended up being somewhat similar to the existing lines and those proposed by the parties, absent the gerrymandering differences. I experimented with several shapes other than those ultimately chosen here, but found the others I tried were lacking in compactness and were somewhat illogical. Although some of the boundaries coincide with highways and municipal borders, this was not a goal of the plan, but generally is a result of the way the census block populations laid out, and also resulted from common sense. For example, there are census blocks along and including the interstate highways, but

- 42 -

most of these blocks do not contain any people, so sometimes these form natural

boundaries of a district. The same is true of some other roads, parks, commercial

areas, and other areas with very low population density. Most of the boundaries,

however, are simply the result of an attempt to make the districts as regular and

compact as possible and to minimize uneven borders while maintaining population

equality. Some of the borders are, of course, uneven, as this cannot be avoided

when dealing with census blocks.

Although I did not design the plan specifically to achieve any particular

racial percentages, I began the process believing that, based on the evidence of the

geographic concentration of African-American population in North County, a

natural African-American majority district in the vicinity of the current First

District would occur. This in fact happened, and was not the result of any specific

attempt to draw a certain number of African-American districts or to achieve any

particular racial numbers, but was simply a result of the geography of the North

County area and the distribution of African-American voters. The resulting First

District contains approximately 67% African-American residents, while the Fourth

contains approximately 42%. I believe that these districts do not violate the

Voting Rights Act in any way.

I therefore adopt the plan attached here as Appendices A, B, and F, and will

- 43 -

direct the defendant Board of Election Commissioners to implement this plan at once.  Should defendants have difficulty integrating the data I have provided in CD form with County records, counsel should appear at my informal matters docket to seek clarification.

A separate judgment in accord with this opinion is issued this same date.

_____
CATHERINE D. PERRY
UNITED STATES DISTRICT JUDGE

Dated this 21st day of February, 2002.



Appendix A
Court Adopted Plan

| Proposed District | Total Population | Total Area (in acres) | Perimeter (in linear feet) | Number of Blocks | Population Density |
|---|---|---|---|---|---|
| 1 | 145,193 | 24,101 | 7,302,486 | 2,584 | 6.02 |
| 2 | 145,185 | 51,403 | 8,545,546 | 2,003 | 2.82 |
| 3 | 145,187 | 53,131 | 9,216,819 | 1,965 | 2.73 |
| 4 | 145,181 | 45,449 | 7,014,060 | 1,692 | 3.19 |
| 5 | 145,185 | 24,285 | 6,941,162 | 2,410 | 5.98 |
| 6 | 145,192 | 35,693 | 6,290,707 | 1,446 | 4.07 |
| 7 | 145,192 | 101,054 | 10,960,969 | 1,590 | 1.44 |
| **Total** | **1,016,315** | **335,115** | **56,271,748** | **13,690** | **3.03** |

| Proposed District | Total Population | White Only | | Black Only | |
|---|---|---|---|---|---|
| | | Number | Percent | Number | Percent |
| 1 | 145,193 | 44,295 | 30.51% | 96,762 | 66.64% |
| 2 | 145,185 | 120,983 | 83.33% | 15,476 | 10.66% |
| 3 | 145,187 | 134,089 | 92.36% | 4,262 | 2.94% |
| 4 | 145,181 | 80,476 | 55.43% | 60,781 | 41.87% |
| 5 | 145,185 | 125,517 | 86.45% | 12,043 | 8.29% |
| 6 | 145,192 | 140,486 | 96.76% | 1,102 | 0.76% |
| 7 | 145,192 | 134,984 | 92.97% | 2,880 | 1.98% |
| **Total** | **1,016,315** | **780,830** | **76.83%** | **193,306** | **19.02%** |

# Appendix B
# Court Adopted Plan

PLAINTIFF'S
EXHIBIT

1C

PENGAD-Bayonne, N. J.

St. Louis County Council
Corbett Plan One

Legend
— ● — Interstate Highways
— — US Highways
— — — Major Roads



Appendix C
Corbett One

PLAINTIFF'S
EXHIBIT
2C
PENGAD-Bayonne, N. J.

**St. Louis County Council**
**Corbett Plan Two**



Legend
—Interstate Highways
—US Highways
   Major Roads

Appendix D
Corbett Two



EXHIBIT
Ballard
1

UNITED STATES DISTRICT COURT - EASTERN MISSOURI
INTERNAL RECORD KEEPING

AN ORDER, JUDGMENT OR ENDORSEMENT WAS SCANNED, FAXED AND/OR MAILED TO THE
FOLLOWING INDIVIDUALS ON 02/21/02 by ldreon
                    4:01cv2006      Corbett vs Sullivan

42:1983 Civil Rights Act

```
Gordon Ankney -  2525              Fax: 314-552-7003
Lawrence Friedman -  3159          Fax: 314-552-7039
Mark Hearne -  10493               Fax: 314-613-2550
Stephanie Karr -  31774            Fax: 314-725-8789
Amy Marchant -  100302             Fax: 314-613-2550
Michael Morris -  3900             Fax: 314-552-7082
Kevin O'Keefe -  10578             Fax: 314-725-8789
Robert Rodenbush -  78451          Fax: 314-613-2550
Stephen Schoenbeck -  4299         Fax: 314-613-2550
Steven Sherman -  84878            Fax: 314-552-7000
Elbert Walton -  5481              Fax: 314-388-1325
Jacob Zimmerman -  102779          Fax: 314-552-7000
```

SCANNED & FAXED BY:

FEB 2 1 2002

DJO